Filed 9/29/20  P. v. Colon CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C084537 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F06476) |
| v. | OPINION ON TRANSFER |
| OMARI COLON et al., | |
| Defendants and Appellants. | |

A jury found defendants Omari Laquan Colon and Faragi Lewayne Woodard[1] guilty of three counts of first degree robbery of three residents of a home (two parents and their eldest daughter), along with two other counts against defendant Woodard that are not pertinent on appeal.  It also sustained allegations that they were acting in concert,

---

[1] Defendant Colon's middle name is erroneously omitted from his abstract of judgment, and defendant Woodard's middle name is spelled in a variety of ways in the record.  Both should be addressed upon remand.

1

that defendant Colon personally used a gun in committing the three robberies, and that defendant Woodard was armed with a gun. The trial court, as explained in more detail in the Discussion, sentenced defendants to state prison. It also dismissed trailing misdemeanor matters as to both defendants in the interest of justice, which are not at issue in this appeal.

On appeal, both defendants contend that their trial counsel were ineffective in not moving to suppress identifications of them that the home's residents made individually at separate in-field showups of each defendant. Defendant Colon adds arguments that his multiple gun enhancements violate the rule against splitting offenses (see *People v. Hammon* (1987) 191 Cal.App.3d 1084, 1088, 1092-1093 & fn. 9 [discussing nature of rule], disapproved in *People v. Harrison* (1989) 48 Cal.3d 321, 334, as to its application of rule to serial sex offenses), and in any event postconviction amendments to the statute (Pen. Code, § 12022.53)[2] require remand to the trial court for it to exercise the newly granted discretion to strike the enhancements. Defendant Woodard argues the trial court wrongly relied on the same fact to impose both a *middle* principal term and consecutive sentences, otherwise erred in imposing consecutive sentences, and failed to take mitigating factors into account. He further argues that the court did not properly calculate his custody credits.[3]

We originally remanded for the trial court to exercise its discretion as to striking the gun enhancements for defendant Colon, and to clarify the custody credits of defendant Woodard. We otherwise affirmed the judgment.

---

[2] Undesignated statutory references are to the Penal Code.

[3] Defendant Woodard purported to join in advance any arguments that defendant Colon might raise in his subsequently filed brief. We disregard this purported joinder. (*People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 364; *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

Defendants petitioned for rehearing based on section 1001.36, arguing the matter should be remanded for the trial court to determine whether they should be granted mental health pretrial diversion. We denied rehearing but authorized a request for diversion in the first instance in the trial court.

Our Supreme Court granted review but deferred further action pending disposition in *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*). Following its decision in *Frahs*, the court transferred this matter back to us with directions to vacate our decision and reconsider the cause in light of *Frahs*. In *Frahs*, the court found section 1001.36 applies retroactively to defendants whose cases were not yet final when the Legislature enacted section 1001.36. (*Frahs*, at pp. 640-641.) The court further concluded a defendant need only argue he suffers from a qualifying mental disorder to be entitled to a limited remand to allow the trial court to conduct a mental health diversion eligibility hearing. (*Id.* at p. 640.) As we are bound by our Supreme Court's decision in *Frahs*, we will conditionally remand for the purpose of determining defendants' eligibility for mental health diversion under section 1001.36. Our holding as to defendants' other appellate claims remains unchanged.

## FACTUAL AND PROCEDURAL BACKGROUND

The circumstances of the offense themselves are relevant primarily for context. We will incorporate other pertinent facts in the Discussion.

In September 2014, a family was living in their Florin-area home, including three children (then aged 16, 13, and 12). It was later in the evening, and the father was starting up a fire in the barbeque pit in the backyard as it was getting dark. Four men jumped over the fence into the backyard. Two pointed guns at him and told him to put up his hands.

3

They directed the father into the house.  As the father entered, he was speaking loudly in the hope of alerting his oldest daughter to the intruders.  The 16-year-old daughter, who was in her bedroom, heard him and called 911.

The mother and the other two children were in the living room.  The intruders demanded money and marijuana, which the residents denied having.  The intruders struck the father in the back of his head with a gun, and then kicked at him as he lay on the ground.  One of them went into the older daughter's bedroom to bring her into the living room with the rest of the family.  She managed to hide her phone, with the line still active, under a pillow.  Some of the intruders began to ransack the house, going through all the rooms.  They collected various items, including phones, a tablet, a laptop, a wallet, a purse, and a video gaming station, ripping a smart phone from the mother's hand.

Hearing an approaching helicopter after about 15 minutes that they correctly surmised signaled the arrival of law enforcement, the intruders fled into the backyard.  They knocked down the back fence and ran off.  Confirming that they were gone, the father told everyone to run out the front door and await the authorities.  The mother then called 911 again.

Deputies detained the codefendants at separate locations.  The father made a field identification of defendant Colon, and he and his daughters made field identifications of defendant Woodard.

Defendant Colon did not testify.  Deputies did not find a gun on his person, or recover any firearm despite their search of an extensive area.  Defendant Woodard testified that he was a close friend of defendant Colon, but was not with him in the later part of the evening after they had dinner together.

**DISCUSSION**

**1.0    Defendants Have Failed to Establish Ineffective Assistance of Counsel in the Failure to Move to Exclude the Witness Identifications of Defendants**

Defendants assert that their trial counsel could not have had a reasonable tactical basis for failing to move to exclude the father's identifications of defendant Colon and the family's identifications of defendant Woodard. On direct appeal, this is not a viable contention.

Where the record is silent regarding trial counsel's litigation tactics, we must find that counsel did not fall below an objective standard of reasonableness according to prevailing professional norms unless counsel was asked for an explanation and failed to provide one, or unless any reasonable attorney would not have made the same choice. In addition, a defendant must establish on appeal that a more favorable result is reasonably probable in the absence of trial counsel's failing. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215, 217; *People v. Pope* (1979) 23 Cal.3d 412, 426.) A failure to object to evidence is generally not a profitable basis for challenging the competence of trial counsel. (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

With respect to an identification procedure, a defendant must establish that it is *unnecessarily* suggestive with a substantial likelihood of misidentification, and that it was not otherwise reliable under the totality of the circumstances. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989-990.)

California courts (and the United States Supreme Court) have consistently emphasized that a single-person field identification is not *inherently* unfair, and any *potential* unfairness is outweighed because it serves the *necessary* purposes of a prompt identification while memory of the offense is fresh and the exclusion of innocent persons to allow investigators to track the malefactor more quickly. (*People v. Cowger* (1988) 202 Cal.App.3d 1066, 1071-1072; accord, *People v. Ochoa* (1998) 19 Cal.4th 353, 413;

*Stovall v. Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206].)[4] An inherent necessity in such circumstances for the security of officers and witnesses are restraints on the potential suspect. (See, e.g., *United States v. Kessler* (9th Cir. 1982) 692 F.2d 584, 586 [noting that use of handcuffs or other indicia of custody will not invalidate a showup where necessary for prompt and orderly presentation of the suspect, consistent with protection of the officers and witnesses].) Thus, the appearance of suspects in restraints does not contribute to any *unnecessary* suggestiveness in the identification, particularly where the record does not have any indication that law enforcement made express or implied insinuations to the witness to encourage the identification of the suspect as the malefactor. (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 386; *People v. Johnson* (1989) 210 Cal.App.3d 316, 323 [suspect escorted to station house where witness was present; this was not unnecessarily suggestive where witness not told that he would be shown actual suspect].)

We offer two observations before we discuss additional facts relating to the field identifications in this case. In the first place, these are the facts *as developed at trial*; as a result, they do not necessarily reflect the knowledge of trial counsel on direct appeal for purposes of bringing any *pretrial* motion to suppress. Moreover, we are not resolving the issue of whether the field identifications were in fact unnecessarily suggestive and unreliable; the ultimate question is simply whether *any* reasonable attorney would have come to that conclusion and moved the court to exclude the identifications at trial rather than simply argue to the jury that it should not give any weight to them.

---

[4] Given the uniform body of California law to this effect, we disregard defendant Woodard's reliance on nonbinding authority to the contrary. We also reject defendant Colon's invocation of secondary authorities as a basis for calling the identifications into question as a matter of law.

6

The broadcast description to the deputies in pursuit described the suspects as "four black male teens wearing all black and one had dreads." The deputy responding to the residence stated the father's description was "four or five male blacks, dreads, black clothes." One of them had striped shorts; another one was wearing a "black zipped-up hoodie" with jeans. Their ages were in the range of 18 to 28.

The helicopter had trailed defendant Colon from the backyard almost to a gas station parking lot, at which point the pilot lost contact for 45 seconds until a deputy on the ground with whom the pilot was in continuous contact reported that he had detained defendant Colon at the gas station. When a deputy encountered defendant Woodard leaving a nearby apartment complex, the latter was visibly out of breath and sweaty. He fled when approached and was eventually tracked to a backyard where a police dog seized him. Defendant Woodard forcibly resisted arrest. At trial, he explained that he had evaded the deputies because he had an outstanding misdemeanor warrant. He did not explain why this would lead him to forcibly resist arrest after the police dog seized him.

At trial, the father testified he had noted one intruder (defendant Woodard) was wearing jeans and a hooded zippered sweatshirt. Deputies brought the father to an ambulance where defendant Woodard was being treated. A deputy gave him a standard admonishment that the person detained might or might not be one of the intruders. After looking at him for 10 to 12 seconds, the father was 70 to 80 percent certain he was one of the intruders on the basis of the clothing (dark, with jeans and a zippered hoodie) and the hair (stating at trial that his certainty was now 100 percent; at the time, with defendant Woodard's face bloodied and dirty, he preferred to be cautious lest he identify an innocent man).

The father had stared at the face of intruder who had approached him in the yard with a gun (defendant Colon) and was struck by the fact the latter was wearing plaid shorts similar to his own. He had also mentioned the intruder's dreadlocks to deputies. When lying on the floor, he had surreptitiously looked up "numerous times" at the

7

intruders while they were present, and the two who remained in the living room were the codefendants. A deputy brought the father to the gas station where defendant Colon was being detained. Immediately, the father was entirely certain that this was one of the armed intruders who had walked up to him with a gun, based on the face and because the suspect had been wearing the exact same shorts as the father (black, white, and orange plaid), and "the [orange] shoes, the dreads, everything," as well as a tattoo on defendant Colon's arm (which he characterized as a "T" or a "J"). He acknowledged at trial that the letters in defendant Colon's tattoos displayed to him did not include either a "T" or a "J."

Another deputy also brought the children to the ambulance in which defendant Woodard was detained one at a time, admonishing them that the detained person might or might not be one of the intruders. After viewing him for a few seconds, the oldest daughter was absolutely certain he was the one who pulled her from her room; the other daughter was confident that he was the intruder who pulled her sister from her room, based on his face and clothing. Their younger brother was not sure.

The older daughter asserted at trial that the man with dreadlocks and a gun (whom she identified at trial as defendant Colon) had seized her from her bedroom and then stood over the family, but she had not mentioned plaid shorts (instead describing him as wearing black jeans), and she pointed at defendant Colon as the man she had identified at the ambulance (rather than defendant Woodard). The younger daughter testified defendant Colon was the man with dreads and colorful shorts who pointed a gun at her father, but she also seemed to conflate him with the man "in the ambulance," i.e., defendant Woodard.

Deputies brought the children individually to view two other detained suspects. The two daughters thought one of them was an intruder; the brother was again unsure. (This defendant was charged along with the codefendants, but is not part of this trial or appeal.) The older daughter admitted that she had not gotten a good look at the other

8

intruders. The daughters said the other suspect was not an intruder; their brother was not sure.

There was controverted testimony from a lawyer who had briefly represented defendant Woodard before trial. She went with an investigator to interview the father and the oldest daughter at their home. She claimed at trial to have identified herself as a defense lawyer; the father testified that he had thought she was from the prosecutor's office, and she had never identified herself as a defense lawyer. She claimed at trial that the father had twice asked if she was related to one of the intruders because she looked like them (she described herself as having "African-American and Scandinavian" ancestry); the father denied this at trial, and the former defense lawyer admitted that her investigator's report did not reflect any remark to this effect. According to the former defense lawyer, the father said he was wearing the shorts that resembled defendant Colon's, which she thought were not the same (although she did not photograph them or describe them in her notes). She testified the father disclaimed ever receiving admonishments before seeing the detained suspects, and both he and his daughter had stated that they expected to see the invaders when they arrived for the field investigations. The father stated that he had been focused on faces, not clothing. She admitted that the father had mentioned a prominent tattoo in the shape of a "T" on the forearm of the man with the gun.

In light of these facts, a reasonable attorney could conclude that any motion to exclude the field and trial identifications would probably be futile. (*People v. Anderson* (2001) 25 Cal.4th 543, 587 [not required to make frivolous motions]; *People v. Memro* (1995) 11 Cal.4th 786, 834 [no need to make "probably" futile motion].) None of the circumstances about the field identification in the testimony of the deputies and the witnesses indicated it was any more suggestive than an ordinary field identification, and deputies testified that they had admonished the witnesses against assuming these were two of the intruders. The daughters excluded another suspect despite the circumstances

9

of the field identifications, and their brother did not identity anybody. The evidence from the former defense lawyer was at best contradictory evidence that was not corroborated in her notes or her investigator's, and it was certainly not of such strong value that trial counsel would believe that the court would credit it, particularly in light of the father's testimony establishing reliability: That he had repeated opportunities to observe the codefendants; had correctly described in advance defendant Colon's shorts, dreadlocks, and at least some sort of tattoo on his forearm; and had given at least a description of the generic attire that defendant Woodard was wearing. While the testimony of the daughters at trial seemed to confuse which defendant was which, this did not detract from their certainty that both were nonetheless involved and again did not eviscerate the weight of their identifications to the point that a reasonable attorney would believe that a court would exclude them, particularly where their father had also identified both defendants.

In short, it would have been a reasonable trial tactic to refrain from making a motion and instead argue to the jury that it should not give weight to the identifications in light of the suggestiveness of field identifications (as indeed trial counsel for defendant Colon asserted in closing argument). We therefore reject the claim of ineffective assistance for purposes of this direct appeal.

**2.0 Absent Authority for the Proposition That Imposing Multiple Enhancements Under Section 12022.53 to Reflect Multiple Victims Amounts to "Splitting" a Single Gun Enhancement, Existing Precedent Authorizes the Practice**

Of uncertain jurisprudential provenance, there is nonetheless a distinction between the prohibition on multiple prosecutions for a single "offense" as opposed to multiple punishments for offenses arising out a single transaction, although analytic principles developed in the latter context are relevant to the former. (*People v. Hammon*, *supra*, 191 Cal.App.3d at pp. 1092-1093 & fn. 9.) In the former context, the remedy is reversal of the impermissible convictions rather than staying the punishment for them. (*Id*. at p. 1093.)

Our Supreme Court has ruled unequivocally that when there are multiple victims in offenses involving use of a gun in a single transaction, it is proper to impose an enhancement in connection for *each* offense. Beginning in 1993, the court overruled its prior holding that a trial court could impose only one gun enhancement for multiple offenses involving multiple victims arising out of a single transaction, agreeing attempts to give it a consistent interpretation were "illogical" and it would be " 'grotesque' " to apply the principle because it would otherwise allow a defendant to add additional victims without consequence. (*People v. King* (1993) 5 Cal.4th 59, 77-78 [defendant killed one victim and attempted to kill other victim during robbery; § 12022.5, personal use of a gun].) It expanded upon this holding in *In re Tameka C.* (2000) 22 Cal.4th 190, in which the defendant fired one shot at four victims in a single occasion (as well as separately shooting another victim). (*Id*. at p. 192.) The juvenile court imposed enhancements on all offenses. (*Id*. at p. 193.) "This court has held that multiple firearm-use enhancements may be imposed . . . when the defendant uses a firearm in a single, indivisible transaction that results in injury to multiple victims." (*Ibid*.) "Under the *King* rationale, a robber who enters a convenience store and obtains the valuables of seven patrons with a single display of a firearm has committed seven robberies, and each felony is subject to enhancement for use of a firearm. Keeping in mind both the effect on the victims and the culpability of the defendant, we [do not] see [any] distinction between this situation and one in which a defendant commits multiple assaults with a single shot from a firearm." (*In re Tameka C.*, at p. 196.) In *People v. Oates* (2004) 32 Cal.4th 1048, the court then explicitly extended this principle to section 12022.53's 25-year penalty for firing a gun and inflicting great bodily injury, where only *one* of a group of five people was struck and injured when the defendant fired two shots at them, but the trial court imposed the enhancement as to all five counts of attempted murder. (*Id*. at pp. 1052, 1053-1054.) *Oates* noted that the statute precluded multiple enhancements for its various provisions for each *crime*, but not for the *transaction* out of which multiple

11

crimes against multiple victims occurred.  (*Id*. at p. 1057.)  It was thus neither "anomalous nor unique" that the number of enhancements for inflicting injury with a gun would turn on the number of people present during the criminal transaction.  (*Id*. at p. 1060.)

Defendant Colon concedes that under these controlling precedents he cannot challenge his multiple enhancements under section 12022.53 for the robberies of the three family members in their home.  He further admits that "We [*sic*] have not found a case applying the [splitting] rule to enhancements," but he contends it is "only logical" to apply it here, asserting in this regard that the cases discussed above did not consider this exact principle and therefore do not preclude him from raising the issue.

As an intermediate appellate court, we are loathe to upset settled jurisprudential apple carts, a task beyond our purview absent a compelling basis to do so.  Because it is a long-settled proposition that the presence of multiple victims will authorize multiple punishments for an act of violence arising out of a single transaction under section 654 (e.g., *People v. Newman* (2015) 238 Cal.App.4th 103, 112), and—as noted above—the principles surrounding multiple punishment inform the analysis under the "splitting" rule's proscription against multiple convictions, we conclude that a gun enhancement may be imposed for each offense against a separate victim in the same transaction without transgressing the rule.

### 3.0     Remand for Consideration of Whether to Strike Defendant Colon's Section 12022.53 Enhancements

Effective 2018, section 12022.53 now provides that a trial court may, in the interests of justice, strike an enhancement pursuant to this section.  (*Id*., subd. (h); see Stats. 2017, ch. 682, § 2.)

Defendant Colon asserts he is entitled to retroactive application of the amendment to his pending appeal.  In conclusory fashion, he simply requests a remand because nothing in the record indicates the manner in which the trial court might exercise its

discretion on the issue. The People concede, in light of the uniform body of law that has considered this amendment, that it applies retroactively to any case still pending on appeal. (E.g., *People v. Woods* (2018) 19 Cal.App.5th 1080, 1083.) We accept the concession. They contend, however, that a remand for the trial court to exercise this newly awarded discretion would be an idle act. (E.g., *People v. McVey* (2018) 24 Cal.App.5th 405, 419.)

The discretionary power is for the trial court to exercise in the first instance and not this court. (*Collateral Loan & Secondhand Dealers Assn. v. County of Sacramento* (2014) 223 Cal.App.4th 1032, 1041, fn. 7.) As a result, unless the operative facts are such that they compel a result as a matter of law, we should ordinarily remand for the exercise of discretion.

In connection with defendant Colon, the trial court accepted the recommendation of the lower term for the principal term "because of his youth [he was born in 1995] and the materials he has submitted" and in light of "the gun enhancement for which he'll be punished [that] attaches a significant time," as well as its ability to impose consecutive sentences for the three robberies. This abbreviated elucidation of its thinking does not illuminate us with respect to whether the trial court would have stricken one or both of the consecutive enhancements after balancing off the imposition of the lower term with the principal enhancement and consecutive sentences. We therefore remand for reconsideration of defendant Colon's sentence.

## 4.0    Defendant Woodard's Sentencing Claims Are Without Merit

The trial court identified a number of aggravating factors in sentencing that applied to defendant Woodard: the crime involved great violence; great bodily harm; the threat of great bodily harm; other acts evincing cruelty, viciousness, or callousness; the commission of the crime demonstrated planning, sophistication, or professionalism; and the crime involved violent conduct representing a serious danger to society. It cited the

13

mitigating factor of his youth (not yet 23 years old in 2014) and acknowledged that it had "considered the letters . . . submitted on his behalf" as attached to defense counsel's cover letter including "character letters regarding sentencing in this case." It found the three robberies were predominantly independent of each other, with separate acts of violence against separate victims (which included uncharged crimes against the two youngest siblings, who were vulnerable and greatly traumatized). Thus, as with defendant Colon, the trial court exercised its discretion to impose consecutive sentences. On the principal term, it imposed the midterm sentence because the aggravating factors outweighed the mitigating factors.

4.1     *Prohibitions on "Dual Use of Facts" Do Not Apply to This Case*

As defendant Woodard frames his first argument, "The trial court is not permitted to use the same fact to sentence a defendant to an upper [*sic*] term and to sentence a defendant consecutively on multiple counts. (Cal. Rules of Court, rule 4.425.) That the court cited violence as a factor supporting both the midterm and consecutive sentences therefore represents an impermissible dual use of the same fact." He further contends (in an argument unrelated to the heading)[5] that "violence" cannot be an aggravating factor because it is inherent in robbery.

These arguments are frivolous. Even if "violence" were the sole factor on which the trial court based its sentencing decisions, the imposition of a *middle term* allows the court to rely on the same aggravating factor to impose consecutive sentences; the concept of "dual use of facts" does not have any application. (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1104 (*Sperling*), see *id*. at pp. 1105-1106 (Yegan, J., conc. opn.

---

[5] This court has long expressed its disapproval of this style of briefing, which forfeits our plenary consideration of claims raised this way. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10; *Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 202.)

14

[concurring with self to note frivolous nature of sentencing contentions]).) Moreover, the trial court in fact identified *multiple* aggravating factors, set out above, which would have rendered any "dual use of facts" manifestly harmless. (*People v. Osband* (1996) 13 Cal.4th 622, 728-729.)[6] Finally, the gratuitous acts of violence against the subdued father are not incidental to the act of robbery such that they are subsumed within its commission. (Cf. *People v. Dixie* (1979) 98 Cal.App.3d 852, 856-857 ["violence" not inherent in murder and therefore the manner of commission can be aggravating factor].)

4.2 *Nothing More Than Multiple Victims Is Required to Impose Consecutive Terms*

Defendant asserts the trial court erred in finding the robberies were predominantly independent of each other in imposing consecutive terms because they were "essentially one act with multiple victims." The trial court's reference to multiple victims is of itself sufficient to support consecutive sentences. (*People v. Caesar* (2008) 167 Cal.App.4th 1050, 1060.) We therefore find this contention frivolous.

4.3 *The Record Belies the Claim of Failure to Consider Mitigating Factors*

Although, as noted above, the trial court *explicitly* stated on the record that it had considered the mitigating factor of defendant Woodard's youth and the materials he had submitted, on appeal he insists the trial court "failed to acknowledge" his mental or physical condition detailed in the other materials, or his insignificant criminal record. The argument is frivolous.

Defendant Woodard's criminal record was part of the probation report that the trial court considered. The trial court also explicitly referenced the material defense counsel had submitted, and the mitigating factor of youth specified in the probation report. A trial court is presumed to have considered all mitigation factors that are included in the

---

[6] Given this conclusion, we do not need to consider the People's argument that the rule against dual use of facts is now a dead letter in light of changes to sentencing law.

probation report and sentencing submissions from defense counsel, absent evidence in the record showing the contrary, and need not explain its reasoning if it chooses not to credit them. (*Sperling*, *supra*, 12 Cal.App.5th at p. 1102; *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582-1583.) Furthermore, defense counsel and the trial court in fact explicitly discussed the issue of the lack of a significant criminal record. As this argument does not establish the necessary factual prerequisite, we reject it.

**5.0    We Will Remand for the Trial Court to Interpret the Unclear Record with Respect to Defendant Woodard's Custody Credits**

At the sentencing hearing, the trial court (with the concurrence of defense counsel) determined that defendant Woodard had 91 days of custody credit, against which the court awarded 14 days of conduct credits. This is reflected in the court's summary minute order. Citing an earlier summary minute order, defendant Woodard contends the document purports to demonstrate that he had posted bail on November 13, 2014, and the record otherwise establishes that the court remanded him back into custody in March 2017 after the return of the verdicts. By his calculation, this shows that he had 112 days of custody and was entitled to 16 days of conduct credit.

The People note that the probation report asserts defendant Woodard was released on bond on October 22, 2014, which would be in accord with the trial court's calculation of days of custody. They concede, however, that the minute order could be interpreted in the manner that defendant Woodard posits (in which case, as they point out, the correct totals would be 113 days of custody credits and 16 days of conduct credits). They therefore request that resolution of this matter requires a remand to the trial court to explain the discrepancy between the summary minute order and the probation report.

Given that we must remand the matter in any event as to both defendants, we agree that the trial court is best suited to interpret the shorthand in its own records. We thus agree with the People that we should allow the trial court to resolve this question. (*In re Antwon R.* (2001) 87 Cal.App.4th 348, 353.)

16

**6.0    We Will Remand for the Trial Court to Conduct a Mental Health Diversion Eligibility Hearing**

Defendants ask us to remand the matter so the trial court can determine whether they are eligible for pretrial diversion due to a specified mental disorder under the recently enacted section 1001.36, which they argue is retroactive as to all cases not yet final.  The People concede, and we agree, that pursuant to our Supreme Court's decision in *Frahs*, defendants are entitled to have the trial court determine their eligibility for mental health diversion under section 1001.36.  (*Frahs, supra,* 9 Cal.5th at pp. 640-641.)

Section 1001.36, which went into effect before defendants' judgments became final (Stats. 2018, ch. 34, § 24, eff. June 27, 2018), provides pretrial diversion may be granted if the trial court finds all of the following criteria are met:  (1) the defendant suffers from a recently diagnosed mental disorder enumerated in the statute;[7] (2) the disorder was a significant factor in the commission of the charged offense, and that offense is not one of the offenses enumerated in subdivision (b); (3) "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment"; (4) the defendant consents to diversion and waives his right to a speedy trial; (5) the defendant agrees to comply with treatment as a condition of diversion; and (6) the defendant will not pose an unreasonable risk of danger to public safety, as defined in section 1170.18, if treated in the community.  (§ 1001.35, subd. (b)(1)-(2).)  If the treatment under pretrial

---

[7] Section 1001.36, subdivision (b)(1) provides, in pertinent part:  "Pretrial diversion may be granted pursuant to this section if all of the following criteria are met:  (A) The court is satisfied that the defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia."

diversion is deemed successful, the charges shall be dismissed and the defendant's criminal record expunged. (§ 1001.36, subds. (b)(1)(A)-(C), (c)(3), (e).)

The statute further provides: "At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion. The hearing on the prima facie showing shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel. If a prima facie showing is not made, the court may summarily deny the request for diversion or grant any other relief as may be deemed appropriate." (§ 1001.36, subd. (b)(3).)

In *Frahs*, our Supreme Court concluded *Estrada*'s inference of retroactivity applies to section 1001.36 such that defendants with qualifying mental disorders whose cases are not yet final are entitled to limited remand for the trial court to determine whether they are eligible for mental health diversion. (*Frahs, supra,* 9 Cal.5th at pp. 624-625; see *In re Estrada* (1965) 63 Cal.2d 740.) The "possibility of being granted mental health diversion rather than being tried and sentenced 'can result in dramatically different and more lenient treatment.' " (*Frahs*, at p. 631, quoting *People v. Superior Court* (*Lara*) 4 Cal.5th 299, 303.) As the court explained, "the impact of a trial court's decision to grant diversion can spell the difference between, on the one hand, a defendant receiving specialized mental health treatment, possibly avoiding criminal prosecution altogether, and even maintaining a clean record, and on the other, a defendant serving a lengthy prison sentence." (*Frahs*, at p. 631.) Thus, "the ameliorative nature of the diversion program places it squarely within the spirit of the *Estrada* rule," and the program retroactively applies to defendants whose cases are not yet final. (*Ibid*.) That is the case for defendants here.

Both Colon and Woodard introduced evidence demonstrating a qualifying mental disorder. Colon's probation report noted he was prescribed medication for attention deficit hyperactivity disorder (ADHD) and bipolar disorder. His sentencing statement in

mitigation further noted his life-long struggle with ADHD and bipolar disorder, which he had suffered from since his youth.

Similarly, in a letter to the court, Woodard's defense counsel noted that he is "slow and confused often" and that his mother "always had to care for her son, based on his disability." At sentencing, defense counsel notified the court Woodard suffered from "mental health and medical issues that he's had since he was a child." Woodard's mother also explained to the court that her son had "special circumstances where he doesn't understand a lot of things." His stepfather wrote the court that Woodard had mental issues from a young age. According to Woodard's probation report, he had suffered ADHD and anger management issues 10 years prior, although he currently was not prescribed medication for the condition. He also received Social Security disability income.

Given the above evidence, defendants apparently meet at least the first threshold requirement for eligibility for mental health diversion--they suffer from a qualifying mental disorder (ADHD for Woodard and ADHD and bipolar disorder for Colon). (§ 1001.36, subd. (b)(1)(A); *Frahs, supra,* 9 Cal.5th at p. 640.) A conditional remand for the trial court to conduct a mental health diversion eligibility hearing is appropriate under the circumstances.

**DISPOSITION**

We conditionally reverse the judgments of defendants Colon and Woodard and remand to the trial court for an eligibility determination under section 1001.36. If the trial court finds that Colon or Woodard suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If defendants successfully complete diversion, then the court shall dismiss the charges. However, if the court determines that either defendant does not

19

meet the criteria under section 1001.36, or if either defendant does not successfully complete diversion, then his convictions and sentence shall be reinstated.

If the trial court reinstates defendant Colon's sentence, it shall determine whether to exercise its discretion to strike the gun enhancements applicable to him, and resentence Colon accordingly.  If the trial court reinstates defendant Woodard's sentence, it shall determine the correct amount of custody and conduct credits for him.  If necessary, the court shall file any amended abstracts of judgment reflecting its resolution of these issues and forward certified copies to the Department of Corrections and Rehabilitation.[8]

_____/s/_____
BUTZ, J.[*]


We concur:


\_\_\_\_\_/s/_____
DUARTE, Acting P. J.


\_\_\_\_\_/s/_____
HOCH, J.

---

[8]  See footnote 1, *ante*.

[*]  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.